[S. F. No. 15220. In Bank.—April 19, 1935.]

THE TIMES–MIRROR COMPANY (a Corporation), Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

Cosgrove & O'Neil and Frank B. Yoakum, Jr., for Petitioner.

Ray L. Chesebro, City Attorney, Robert F. Shippee, Frederick von Schrader and Leon T. David, Assistants City Attorney, and Arthur W. Nordstrom, Bourke Jones and Walter L. Bruington, Deputies City Attorney, for Respondents.

THE COURT.—This cause comes to this court on a petition for a writ of *mandamus* wherein petitioner prays for an order directing the Superior Court of the County of Los Angeles to set for trial and proceed therewith to final determination and judgment certain condemnation proceedings consolidated for the purpose of trial in the Superior Court of Los Angeles County. Said consolidated proceedings were instituted by the City of Los Angeles to acquire distinct portions of petitioner's real property. One was commenced to acquire the fee in that part sought to be taken for the use of public grounds and buildings, and the other proceeding was brought to acquire an easement in the remainder for street purposes. The trial court refused to reset the causes for trial after they had once been tried and reversed on appeal, and was threatening to enter a judgment of dismissal upon the ground that plaintiff had filed in court a written notice of abandonment of said proceedings, notwithstanding the fact that said notice was filed approxi-

mately one year and five months after the expiration of the thirty-day period provided by statute within which time such notice may be filed. (Sec. 1255a, Code Civ. Proc.) The alternative writ of mandate herein was issued on the application of petitioner, commanding respondents to show cause, and staying in the meantime the entry of a judgment of dismissal pending the hearing of said petition. The asserted rights of the plaintiff to abandon the proceedings and to a judgment of dismissal based upon the filing of notice of abandonment long subsequent to the expiration of the thirty-day period reckoned from the day on which the interlocutory decree or final judgment was filed, and after petitioner, acting solely upon the understanding that its property would be taken for public uses, had constructed a building at another location suitable for its purposes at a great cost, which would not have been constructed and which would not have been necessary but for said understanding, based upon certain agreements and acts of the City of Los Angeles as hereafter set forth, are, in the circumstances of the proceedings had and taken in said condemnation proceedings, important questions presented by this petition.

While this is a *mandamus* proceeding in form, it is in reality a proceeding instituted for the purpose of compelling the continuation of the condemnation proceedings entitled *City of Los Angeles* v. *Klinker,* and the *City of Los Angeles* v. *Times-Mirror Co.,* reported in 219 Cal. 198 [25 Pac. (2d) 826], to a final order of condemnation as prescribed in section 1253 of the Code of Civil Procedure. Both parties have cited said decision as bearing materially on the instant proceeding. It furnishes the ground upon which the arguments of opposing counsel are largely based in support of their respective contentions in the instant proceeding.

The record in the condemnation proceedings necessarily constitutes a part of the record in the instant proceeding.

It is not necessary to restate here in detail the facts from which this court concluded in said decision that the processing equipment and other machinery and mechanical devices and steel and cement construction as described became a part of the realty of the property sought to be condemned

inasmuch as all the questions of law and fact are fully and carefully considered in said decision.

Briefly stated, said consolidated actions were brought by the City of Los Angeles against petitioner, The Times-Mirror Company, a corporation, to condemn and appropriate to public uses the real property, and the improvements thereon, situated at the northeast corner of Broadway and First Streets, owned by petitioner herein, as provided by part 3, title VII, sections 1239 et seq. of the Code of Civil Procedure. The building which occupies said property site extends five stories above the ground level and three stories below the ground level and was especially designed and built for the production, publication and distribution of the ''Los Angeles Times'', a modern metropolitan daily newspaper. The processing equipment was especially designed for installation in said building. Said processing equipment consisted of eight large printing presses, resting upon, imbedded in, and permanently fastened to massive concrete foundations and walls. The building was especially built to accommodate the press foundations and to withstand tremendous strain caused by the vibratory motion of heavy and rapid motion presses and machinery. It is apparent from the description as set forth in *City of Los Angeles* v. *Klinker*, and *City of Los Angeles* v. *Times-Mirror Co.*, a corporation, that said building was not suitable or adaptable to any of the other ordinary commercial or business purposes except that for which it was constructed and that the various articles of mechanical equipment, described in said opinion, became and were fixtures and are a part of the land to which they are affixed, and must be valued and paid for as such. It is so held and that holding is now the settled law of the case. The refusal of the trial court to treat said processing equipment and mechanical devices and machinery as a part of the real estate was the important question decided by the trial court from which the petitioner herein took an appeal to this court and procured a reversal of the judgment.

The complaints in the condemnation proceedings were filed December 21, 1931. The findings of fact and conclusions of law were filed January 25, 1933. The trial court found the value of the parcels of land sought to be condemned to be $1,021,345. This was in full of all compensa-

tion and damage suffered. Plaintiff, respondent herein, caused the interlocutory decree, which is conceded by all parties to the proceeding to be in effect the "final judgment" referred to in section 1255a, to be filed January 25, 1933. Petitioner immediately perfected its appeal. The judgment of reversal was entered by order of this court October 4, 1933.

No question was raised on the part of petitioner by pleading or at the trial or upon appeal as to the right of the city to maintain the proceeding or as to the public convenience or necessity of the city as to the acquisition of said real property, as authorized by ordinance No. 70,691, City of Los Angeles, approved December 7, 1931. In fact, petitioner expressly prayed by way of answer that "the court ascertain and assess the value of the property sought to be condemned . . . together with all improvements thereon pertaining to said land, together with the damages which will accrue to the portion of said larger or entire parcel of land . . . not herein sought to be condemned by reason of its severance from the portion sought to be condemned, and that the court determine and declare the market value of said land . . . sought to be condemned . . . and improvements thereon pertaining to said lands and determine the amount of damage which would accrue to the portion of said larger or entire tract not sought to be condemned by reason of its severance from the portion sought to be condemned" and that the payment of said sums to petitioner be made a condition precedent to condemnation.

No questions were contested at the trial save only those which had to do with compensation in some form, either as to land value or damage suffered by way of severance or from some other cause. The decision on appeal concluded the question as to the plaintiff's undisputed right to maintain the action, and it also fixed and determined the character of certain property in suit to be realty and not personalty.

After the going down of the *remittitur* the cause was reset for trial beginning on July 2, 1934. Counsel for the respondent city on that day appeared and asked for further time in which to prepare for trial, and upon stipulation of counsel, July 16, 1934, was selected as the day on which the trial should commence. At the appointed hour, July 16th,

counsel for respondent city addressed the court, stating that he had served upon defendant and filed in court a notice of motion to dismiss the proceedings; that the City Council approved on July 12, 1934, ordinances abandoning said proceedings and repealing both of the initial ordinances, Nos. 70,690 and 70,691 approved December 7, 1931, authorizing the prosecution of said condemnation proceedings. Said motion of dismissal was based upon said abandoning and repealing ordinances without prejudice to appellant and was based upon "all of the files and papers" in the condemnation proceedings. The notice was dated July 14th, two days before trial day. Counsel for petitioner opposed the granting of the motion of dismissal made upon said written notice of abandonment, on the ground that it was not given or made within the time prescribed by section 1255a of the Code of Civil Procedure, and on the further ground that said city was estopped by its acts and conduct from abandonment. The particular part of said section upon which both the respondent city and petitioner rely to support their respective counter contentions, reads:

"Plaintiff may abandon the proceedings at any time after filing the complaint and before the expiration of thirty days after final judgment, by serving on defendants and filing in court a written notice of such abandonment; and failure to comply with section 1251 of this code shall constitute an implied abandonment of the proceeding. Upon such abandonment, express or implied, on motion of any party, a judgment shall be entered dismissing the proceeding and awarding the defendants their costs and disbursements, which shall include all necessary expenses incurred in preparing for trial and reasonable attorney fees. . . . " Section 1251 referred to therein and which bears upon the questions presented by this proceeding is as follows:

"The plaintiff must, within thirty days after final judgment, pay the sum of money assessed. In case the plaintiff is the state of California, or is a public corporation, and it appears by affidavit that bonds of said state or public corporation must be issued and sold in order to provide the money necessary to pay the sum assessed, then such sum may be paid at any time within one year from the date of such judgment; provided, further, that if the sale of any such bonds cannot be had by reason of litigation affecting

the validity thereof, then the time during which such litigation is pending shall not be considered a part of the one year's time in which such payment must be made.''

The court took the motion under advisement until the following morning, expressing itself, however, as being inclined to grant the motion to dismiss. Upon convening on the following morning the court granted the motion to dismiss the proceedings. Counsel for the respondent city informed the court that he would prepare a formal judgment of dismissal to be submitted to the court at a later day. In the meantime petitioner applied for and this court issued an alternative writ of *mandamus* commanding respondent Superior Court to proceed with the trial of said condemnation proceeding or show cause why it failed to do so. It was further ordered that said Superior Court, pending the hearing upon said alternative writ of *mandamus* and until further order of this court refrain from ordering or entering a judgment of dismissal in said condemnation proceedings.

The petition contains a lengthy history of the action taken by the state, the county of Los Angeles and more particularly the action taken by the City of Los Angeles through its council and officials to mark and lay out in an area in which petitioner's real property is situated, a civic center district in which all buildings of a public character, federal, state and municipal, thereafter to be erected, should be located. The plan required the acquisition by the city, working in conjunction with the county, of several parcels of land held in private ownership and upon which were erected buildings of various types used for business and commercial purposes. First Street marked the southerly limits of said civic center as planned and approved by the state, county and city. By the plan of formation it was deemed necessary to widen First Street to the extent of forty-two feet along its northerly boundary in order to give proper effect to the stately buildings already constructed and to be thereafter constructed in said civic center area, as well as to accommodate increasing traffic. The Times-Mirror Company's buildings, in which the ''Los Angeles Times'' is printed and published, occupied the land comprising the northeast corner of Broadway and First Streets, fronting 182.86 feet on Broadway and 185 feet on First Street. Other buildings of lesser importance used in connection with the publication of said newspaper also front

on First Street. Some five or six years since, the state, in compliance with its agreement to cooperate with and assist in carrying forward said civic center program, began the construction of a large and expensive building within said civic center in which the state Supreme Court, District Courts of Appeal, the Governor of the state and other state officers and employees and state commissions of various kinds now have their offices for the transaction of the business of the state. The civic center plan had its inception in 1925 or 1926, and it has grown to be the settled policy of both the city and county, sponsored and aided by the chamber of commerce and numerous civic organizations and the public in general, as a means of beautification and improvement of the city. The new city hall, a pretentious and imposing building of recent construction, is located on an area of land facing the recently completed state building, both buildings being models of elegance in modern architecture. Other buildings have been constructed or are in contemplation of construction within the area dedicated to public buildings and grounds. The state building which stands crowded against the Times-Mirror building was so placed with the understanding between the Governor of the state and his and the state's representatives that the city and county would, in accordance with their agreements, acquire title to the Times-Mirror Company's property and transfer it to the state, to the end that the Times-Mirror building would be removed. Said building is not by any means an attractive one and its architectural construction in no way harmonizes with the public buildings for which the civic center district was created. The rough and unfinished rear of the Times-Mirror building abuts within two feet of and obstructs the view of said state building looking northerly or northeasterly from Broadway and First Streets, and of course prevents the improvement and beautifying of the ground upon which it stands. It also blocks the completion of the main entrance which was designed to be from the First Street side. The state building was located on its present site on the understanding that the Times-Mirror building should be removed. The city negotiated for the purchase of several parcels of land and instituted condemnation proceedings of other property to the end that the civic center area might be cleared of all obsolete buildings and the grounds beautified. The delay in these matters was

called to the specific attention of the board of supervisors, and city council, by the Governor of the state, the director of finance and others in authority on a number of occasions. As early as June 22, 1931, the Governor pointed out in a letter addressed to the board of supervisors that the state had done everything possible not only to provide adequate office space to serve the people of Los Angeles County but also to "put up a structure in keeping with your civic center plan", but that it was "still surrounded with antiquated structures which we hope will soon be removed". Other letters of similar import were written to the city council and in each case the city council gave assurances that the title to the Times-Mirror and other properties would be acquired by purchase or condemnation. The complaint on the part of the state because of the delay of the city and county in taking steps to cause title to said Times-Mirror real property to be vested in the state, in accordance with the agreements of said city and county, began in 1931 and continued until June, 1934. The state was becoming impatient at the delay and both the city and the county by resolutions on a number of occasions and by other acts recorded and declared their good faith in the premises and their intention of fulfilling their agreements with the state. The fixed policy of the city and county as to the creation of a civic center is well expressed by the adoption of identical resolutions by the city council of the City of Los Angeles and the board of supervisors on the same day, December 5, 1927:

"Whereas the New Hall of Justice of the county of Los Angeles and the New City Hall of the city of Los Angeles have been located within the area approved by the people of the city of Los Angeles for the location of the Civic Center in the city of Los Angeles, and whereas, it is the desire of the city council of Los Angeles as well as of the board of supervisors of Los Angeles county, to conveniently locate all of the public buildings in which will be housed the offices of the several governmental departments of the city, county and state in a given area to the end that an administrative center may be created in such manner as to give the greatest possible opportunity for harmonious treatment in the design of the public buildings to be erected as well as the public grounds and streets surrounding the same, and whereas in order to accomplish this purpose it will be

necessary that additional lands be acquired by the several governmental departments involved, and whereas, while it is generally known and understood that the construction of such a proposed administrative center will entail the acquisition of such additional lands, the fact that the limits of such a center are vague, and uncertain, has resulted and will continue to result in preventing the improvement of property generally in the vicinity of such proposed center,

"Now Therefore be it Resolved by the City Council of the City of Los Angeles that the exterior limits of the proposed administrative center be now defined as follows, to wit: 'All that area of the City of Los Angeles, lying within the following boundary line, to wit: First street on the south; Hill street and its northerly prolongation to the intersection of Castellar and Ord streets on the west; Ord street on the north; and Main street on the east, and as per report of the Board of City Planning Commissioners of December 1, 1927.''

Mr. Lyman M. King, state director of finance, on April 30, 1930, wrote a letter to Honorable Howard Davis, member of the city council and in charge of the proposed changes in regard to the city streets and block surrounded by Spring, First, Broadway, Court and New High Streets, in which he said: "The State needs to know definitely when you will begin proceedings to widen First street, and what arrangements are made to accommodate the Los Angeles Times until such date as possible for the paper to move. . . . The State is anxious to begin this fine improvement at as early date as possible. The Governor will appreciate any activity you may be able to initiate and carry forward looking to the clearing up of the property at the earliest possible moment. Please give me a statement covering what the State may expect." That it was the understanding between the board of supervisors and city council that it was absolutely necessary to the completion of the civic center plan that the Times-Mirror property be acquired, preferably by purchase, but by condemnation as a last resort, there is no room for dispute. On May 10, 1930, the director of finance wrote another letter to Honorable Howard W. Davis, chairman county affairs committee, city council, calling attention to the fact that the state must have a commitment as to the widening of First Street as to when it would be done; also "with regard to the ultimate turning over of

the property of the Los Angeles Times with a statement as to the approximate date thereof''. The letter concludes: ''The state does not expect to begin actual construction until these matters have been definitely cleared.'' Other communications from heads of the state departments on the importance of the city and the county, which were working in unison in the acquisition of the Times-Mirror property, taking definite action that would assure the state that they would cause the title to the Times-Mirror property to pass to the state are to be found in the correspondence which passed and the resolutions adopted by the city council and board of supervisors.

On October 8, 1931, the city council of Los Angeles adopted a resolution reciting the fact that the city and county are jointly interested in the civic center plan and thereupon resolved ''that the city of Los Angeles proceed under eminent domain with the acquisition of the properties abutting on the north side of First street, between Spring and Hill streets, known as the 'Times' property and Klinker property, the city to acquire said entire parcel, . . . '' The method of property adjustment between the two public corporations in the transaction are also set forth.

Said resolution further provided that upon the concurrence of the board of supervisors in said resolution, the city attorney and engineer be instructed to institute proceedings for the acquisition of the said Times and Klinker properties under the law of eminent domain. The board of supervisors, as above shown, afterwards joined with the city in adopting a concurrent resolution. The Klinker property was early acquired by the city.

Again on April 20, 1927, the street widening committee in its report to the city council recommended, as a part of the civic center improvement plan, among other things, that the council reaffirm its former action as to the widening of First Street and the taking of the land from the north side necessary for such widening. The council adopted the report.

On September 11, 1928, Mr. Harry Chandler, president and manager of the Times-Mirror Company, addressed the following communication to the city council and the board of supervisors, which contains a counter proposition that would permit the Times to occupy practically its present

location by the city adding to its northerly side the amount of land taken from its southerly side, necessary for street purposes:

"Sirs:

"The continuing growth of the Los Angeles Times makes it necessary for us to plan on adding to the height of our present building at First and Broadway and expanding to the east by demolishing the small structures thereon and rebuilding to a limit height to conform somewhat with the present main building, wherein is accomplished the mechanical work of producing the Los Angeles Times daily and Sunday. More presses are urgently needed and we have no room in our present basement area to place them. The new structure on our east on ground now the property of the Times-Mirror Company would provide ample basement area for the anticipated growth of The Times during the next quarter of a century. It will undoubtedly take a year's time to put up a building and a like period to build the new, fast presses.

"The Times property, is, of course, not now included in the Civic Center, but there is a good deal of talk floating around that it will eventually be taken in by the County authorities.

"There has also been passed by the City Council an ordinance for the widening of First Street by fifty feet, to be taken from property on the north side. If and when this improvement is made operations of The Times at its present location could not continue for lack of ground area.

"The two dilemmas referred to in the preceding paragraphs confront us, and it will be obvious to members of the Board of Supervisors and the City Council that we must have a solution before The Times management can plan its future. Naturally, we would like to remain in our present location, but we do not wish to be a stumbling block in the path of City and County progress. If the County of Los Angeles is eventually to include our location in the Civic Center we should, in justice, know it without much further delay, and a decision on the part of the Board of Supervisors before any further improvements are made will be beneficial to the County.

"On the other hand, if we are allowed to remain here and the City Government proceeds with the First Street widen-

ing, we offer the suggestion that it might prove extremely economical for the authorities to provide an amount of space equal to that taken from our First Street frontage on the north of our present northerly property line. Here we could build a structure similar in extent and construction to that which is destroyed by the First Street widening.

"I will be glad to meet with representatives of your respective bodies to discuss this whole question at any time that may suit your convenience to the end that a fair, equitable and proper arrangement can be made which will be right and proper for all concerned, or that we may have the assurance that we may go on with necessary improvements and extensions upon our present satisfactory site."

A number of communications passed between the president and manager of The Times-Mirror Company and the board of supervisors as to the fixing of the valuation of petitioner's real property. An appraisal board was named to determine values, which made its report, and other attempts were made to arrive at a valuation acceptable to all concerned. All negotiations as to values having failed, said ordinances of condemnation were approved December 7, 1931. The complaints in condemnation were filed two weeks later, to wit, December 21, 1931.

The interlocutory decree was entered January 25, 1933. The respondent herein deposited the amount of the award, $1,021,345, and costs of suit with the clerk of the court within thirty days after the entry of said decree. The moneys so deposited with the clerk were withdrawn by respondent on November 13, 1933, by order of the court, over the objection of petitioner. On January 5, 1934, the city's attorney was authorized by the city council to employ three expert appraisers to place a valuation upon petitioner's property in conformity with the decision of this court, supra, which ruled that the processing equipment was to be valued as improvements pertaining to realty. Said appraisers fixed the valuation at $1,875,000. The Times-Mirror Company offered as a compromise to reduce said figures to $1,650,000. On May 14, 1934, the county affairs committee of the city council reported the state of affairs to the council and further advised that the county of Los Angeles was liable under its agreement made with the city in 1929 to pay sixty per cent of the award or sixty per cent of any sum that might be agreed upon by way of compro-

mise. Said report also contained a recital that on April 18, 1934, said council adopted the report of the county affairs committee formally asking the board of supervisors for their recommendation as to whether the city should proceed with a new trial or consider the compromise offer of said Times-Mirror Company of $1,650,000; that said board of supervisors voted to recommend that said condemnation proceeding should be retried in accordance with the order of the Supreme Court; it was further recommended that said city council concur in an order for a retrial, and that the city attorney be instructed to proceed to retry said cause. The city council on May 14, 1934, agreeable to said report, adopted a resolution directing its city attorney to proceed with said retrial. Immediately thereafter, to wit, May 18th, said cause was set for trial July 2, 1934, and finally set by stipulation for trial beginning July 16th, whereupon the motion for abandonment was made and granted as heretofore set forth. As late as July 3, 1934, the city council adopted the recommendation of the county affairs committee prepared in response to a communication from the state director of finance dated June 8, 1934, calling the attention of the city and county to the fact that the future development and enlargement of the state building could not be completed unless the city and county of Los Angeles completed their agreements with the state to turn over this property (Times-Mirror Company) to the state. Said recommendation, adopted by the council, reads:

"We recommend that the Director of the State Department of Finance be informed that the City has carried out all of its direct and implied obligations in connection with this matter, that condemnation action was started and judgment was rendered in the Superior Court. An appeal was then taken by the defendant from the decision of the superior court and the supreme court of the state on this appeal ordered a retrial. The council has instructed the city attorney to proceed with the retrial of the case, and same has been set for hearing in the month of July of this year, and as soon as adjudication has been accomplished, the city will use every endeavor to bring the matter to a final successful conclusion at the earliest possible date."

The city attorney filed a recommendation with the city council on July 5th, in which he discussed the policy as to whether the city should proceed with the condemnation pro-

ceedings as directed by the council by its action taken May 14, 1934. In his recommendation he stated that neither the city nor county contemplated in its negotiations the payment of any money whatever for processing equipment, but had in mind only payment for the land and buildings, together with a reasonable cost for moving; he also commented upon the reversal of the Supreme Court which would enhance the value of said property and result in a larger judgment upon a second trial; also upon the cost to the city of a new trial and the questionable amount of public funds available to pay the judgment, the possibility of a compromise and the fact that an initiative petition incorporating an ordinance repealing said ordinances authorizing said condemnation proceedings had been circulated and had received a sufficient number of signatures to compel the council to either adopt it as their own or submit it to the electors at the next general election. Said city attorney stated that there was strong opposition to the acquisition of said property as he interpreted public feeling and the money could be spent for other properties, and that the council should determine whether the acquisition of said property ''as a part of the civic center plan is proper to be carried out at these times of unusual business conditions or whether carrying out the civic center plan could well await a more propitious time for its consummation''. He recommended abandonment and a reinstatement when there is ''a public demand and money on hand sufficient to accomplish the ultimate desired plan for a civic center''. When the question came before the council for action on July 11th, a number of its members openly expressed themselves on the subject. Honorable Howard W. Davis, president of said city council, in addressing himself to the question, said:

''I realize that together with other members of the City Council I have given my word, written and spoken, to the Los Angeles Times and the State of California that the Times properties would be condemned, acquired by the City, delivered to the County and in turn delivered to the State of California. I fully realize that the Times has been placed in an impossible position, an unfair advantage of that institution has been taken, and that the promises that we made both to the Times and the State are being broken. My only reason for going back on my word is that I believe

a large saving to the City in expenses in connection with the coming condemnation proceedings should be saved because due to an initiative petition already filed with the City Clerk an election on this matter would have to be had unless it is here abandoned. It is my opinion that if the matter appeared on the ballot that the lack of understanding among the general voting public would result in the abandonment. Because this matter would necessarily appear on the ballot after the conclusion of the present trial, it seems to me that only common sense necessitates the present abandonment.''

Honorable Stephen W. Cunningham, chairman of the county affairs committee, city council, explained his vote as follows:

''I have signed this resolution with many misgivings, as I realize it means the abrogation of gentlemen's agreements between the city, the State and the Times. I also realize that it leaves the Times with two pieces of property and a number of broken agreements. There is no question that we are breaking promises that should have been kept. However, it seems to me there is nothing else that we can do at the present time and it was with this in mind that I signed the report and am going to vote for its adoption.''

Several other members expressed themselves regretfully at the turn matters had taken. One declared that the people who desired the condemnation proceedings are the same persons who were attacking the council for attempting to adjudicate the matter in court. Another said the public had been misinformed and the council was breaking faith with the state and the Times. The hope was expressed that the property might be acquired at a later period, at a reasonable figure. The mayor in expressing his regret at the action about to be taken said: ''I realize this property is in the civic center and that sooner or later it must be acquired by the city.'' The repealing ordinance was adopted as heretofore set forth.

It may be timely to state here that the Larronde property fronting on the northerly side of First Street, and immediately contiguous to the property of petitioner was condemned and taken by the city in 1931, as a part of the civic center scheme and a strip forty-two feet in width was improved and is now used for street purposes. The buildings were removed from the remainder. Other property was acquired for a similar use.

Petitioner alleges that its president and officers were aware of the proceedings had and taken by the city council, board of supervisors and all the executive, legislative, administrative bodies of said city and of the state of California and of all subsidiary bodies, and was aware of all acts which had a bearing on the development of the civic center plan, and also of the purpose to take the petitioner's property as necessary to said improvement, and that petitioner relied in good faith upon the various acts as shown by ordinances, resolutions, reports, recommendations, statements and other documents herein referred to, and by reason of the same was made to believe and did believe that the taking of its property in the scheme of developing a civic center was inevitable and certain of accomplishment; that in due time after the institution of said proceedings of condemnation, petitioner, to the end that it might continue the publication of said "Los Angeles Times", upon the respondent taking possession thereof, commenced the building and construction of a newspaper plant at the southwest corner of Spring and First Streets, especially constructed as a modern newspaper plant, in which is installed a processing equipment, at a cost of approximately $4,500,000; that said building is not suitable for any other purpose and would not have been constructed but for the action taken by respondent herein; that said building is now idle and unoccupied; that petitioner will be compelled to lose the use of one of said buildings unless respondent be required to prosecute said condemnation suits to final judgment, as neither of said buildings may be adapted to any other business or commercial uses except the use for which they were constructed; that there is no demand for said new building and plant as especially built, excepting the requirements of petitioner in the event said condemnation proceedings are prosecuted to completion; neither is there any demand for petitioner's property and plant now occupied by it, other than the needs and requirements of petitioner or the needs and requirements of said city to acquire the same as a site for public buildings and streets; that the abandonment by respondent city of said proceedings will result in irreparable financial loss to petitioner.

Respondents have demurred to the petition on the ground that it did not state facts sufficient to entitle peti-

tioner to the relief prayed for. They also filed a motion to strike out certain portions of the petition, and finally answered. The demurrer must be overruled if the proceeding was rightfully pending and the court without legal reason refused to proceed with the trial. (*City of San Diego* v. *Andrews,* 195 Cal. 111 [231 Pac. 726].) *Lindsay Strathmore Irr. Dist.* v. *Superior Court,* 121 Cal. App. 606, 610 [9 Pac. (2d) 579], presented the same question in a proceeding in condemnation, wherein the trial court refused to set the case for trial, on the grounds that the complaint did not state a cause of action. The District Court of Appeal held that it cannot be assumed that the complaint may not be amended before the trial and directed the writ of *mandamus* to be issued as prayed for by petitioner. In speaking on the office of the writ it said:

"A writ of mandate may be issued to require an inferior tribunal to perform a clear legal duty which the law especially enjoins when not to do so would amount to an abuse of discretion. The writ has been employed to require a superior court to try a cause. (Sec. 1085, Code Civ. Proc.; *Hill* v. *Superior Court,* 15 Cal. App. 307 [114 Pac. 805]; *Moore* v. *Superior Court,* 20 Cal. App. 299 [128 Pac. 946]; *In re Ford,* 160 Cal. 334 [Ann. Cas. 1912D, 1267, 35 L. R. A. (N. S.) 882, 116 Pac. 757]; *Anderson* v. *Superior Court,* 187 Cal. 95 [200 Pac. 963].) If, however, the act in question involves the exercise of judgment or discretion, *mandamus* will not issue to require its performance. (16 Cal. Jur. 809, and cases cited.)" To the same effect see *Widrin* v. *Superior Court,* 17 Cal. App. 93 [118 Pac. 550]; *Johnston Gas Furnace Corp.* v. *Superior Court,* 106 Cal. App. 166 [288 Pac. 808]; *Wood* v. *Strother,* 76 Cal. 545 [18 Pac. 766, 9 Am. St. Rep. 249]; *Hennessy* v. *Superior Court,* 194 Cal. 368 [228 Pac. 862]; *Scott* v. *Shields,* 8 Cal. App. 12 [96 Pac. 385]. We are of the view that the petition states facts sufficient to justify the issuance of the writ and the demurrer is therefore overruled. The motion to strike out certain portions of the complaint is good as to the allegations which amount to a mere conclusion of the pleader and which may be disregarded, but it is not good as to the material and substantial portions of the complaint, much of which is set forth herein in the form of resolutions, ordinances and other acts heretofore fully set out as grounds of equitable estoppel.

The answer admits the allegations of numerous paragraphs of the petition either by express admissions or by failure to deny and as to the few direct denials the matters therein denied or questioned are not of sufficient materiality as to require a reference, as they would in no way change the result of our conclusion. The case of *City of Los Angeles* v. *Cohn*, 101 Cal. 373 [35 Pac. 1002], determines the right of a citizen or private party to invoke the principle of estoppel *in pais* in exceptional cases where justice and right require. In that case, it was reported to the city council that the predecessor of defendant, who had laid the foundation for his building, was encroaching upon the public street in the erection of his building. The council referred the matter to the city attorney for investigation. The city attorney made a lengthy report to that body, holding that Temple (defendant's predecessor in interest) was the owner of the land. The report was ordered received and placed on file and a synopsis was entered upon the minutes of the board. The building was then erected to completion and nothing further was done by the city until suit brought twenty years later. Conceding the dedication of the property as a highway resulting from the filing of a certain map as a public record, and conceding the filing of said map to have all the force and effect claimed for it and that a dedication to a public use *ipso facto* resulted therefrom, the court nevertheless holds that plaintiff's conduct was such that whatever merit it may have possessed years ago there was no merit in it in the light of the plaintiff city's conduct. The decision so well expresses the principles which equity impels us to apply to the facts of the instant case that we feel justified in quoting therefrom at considerable length:

"While municipal corporations do not own their public streets, and while the laches of municipal officers cannot defeat the rights of the public in those streets, yet individuals have some rights which, in the exercise of common justice, the municipality must respect. Its conduct towards a citizen, pertaining to the boundary line of one of its highways, may be such that it would be a violation of every principle of right and morals to allow it to recede from the stand taken, or the agreement made.

"The foregoing principle is well illustrated and strongly put by Dillon in his work on Municipal Corporations, section 675, wherein it is said: 'It will perhaps be found that neces-

sities sometimes arise of such a character that justice requires that an equitable estoppel shall be asserted even against the public; but if so, such cases will form a law unto themselves, and do not fall within the legal operation of the limitation enactments. The author cannot assent to the doctrine that, as respects public rights, municipal corporations are impliedly within ordinary limitation statutes. It is unsafe to recognize such a principle, but there is no danger in recognizing the principle of an estoppel *in pais,* as applicable to exceptional cases, since this leaves the courts to decide the question, not by the mere process of time, but upon all the circumstances of the case, to hold the public estopped or not, as right and justice may require.' The author cites many cases to support the text, and upon examination of these citations we find the principle recognized and approved, especially by the decisions of the Illinois court. In the later case of *Simplot* v. *Chicago etc. Ry. Co.,* 16 Fed. [350] 360, the text from Dillon is quoted with approval, and Judge Shiras says: 'In the latter cases (referring to cases like the present one) the courts may apply the doctrine or principle of estoppel, and by means thereof, where justice and right demand it, prevent wrong and injury from being done to private rights.' This doctrine is also directly declared in the recent case of *Crocker* v. *Collins,* 37 S. C. 327 [15 S. E. 951, 34 Am. St. Rep. 752], and while it is not for us to say whether or not the facts of that case were sufficient to justify an application of the principle of estoppel *in pais* as against the public, yet the law is there well declared as follows: 'We think, therefore, that mere adverse possession for the statutory period of a street or alley in a town which is a public highway cannot confer a title, but where such possession is accompanied with other circumstances which would render it inequitable that the public should assert its rights to regain possession, then, upon the principle of estoppel, a party may be protected against the assertion of right by the public, in order to prevent manifest wrong and injustice. For example, when the party, either under an honest conviction of right has taken possession of a portion of one of the streets or alleys of the town, and expended his money in erecting buildings thereon without interference on the part of the public, these, or perhaps other circumstances, connected with adverse

possession for the statutory period may afford good grounds for estoppel.'

"To our knowledge there is nothing to be found in the decisions of this court opposed to the doctrine laid down in the text we have quoted from Dillon's work on Municipal Corporations, while in the case of *Fresno* v. *Fresno Canal & Irr. Co.*, 98 Cal. 182 [32 Pac. 943], the principle was stated and incidentally approved. The question being a new one in this state, and a most important one, we will content ourselves with an application of it to the facts of the present case, and not attempt to promulgate any general rule by which every case invoking this doctrine may be weighed and measured. If we concede the existence of the principle of estoppel *in pais* against the public in certain exceptional cases, then this case is rightly decided, for this is an exceptional case. If this character of estoppel may be pleaded where justice and right require it, then it may be successfully pleaded here, for justice to these defendants demands it. There are limits beyond which even a city in representing the rights of the public may not go, and we think the city in the present action has gone beyond those limits. If the city had expressly agreed by its officers with defendants' grantors, even in parol, that a certain line should constitute the boundary line between the street and the grantor's property, and upon the faith of such agreement the grantors had erected a block of buildings flush with the line of the street as agreed upon by all parties, it would be a hard law that would allow the city to repudiate that agreement, and destroy the grantor's property. No court should countenance such a thing, and an estoppel *in pais* will rise up in the pathway of a city to bar it and its principal, the people, from the commission of such a grievous wrong; and to give the acts of this city a very limited meaning we think its conduct in the present case at least equivalent to an oral agreement as to the location of the true boundary line of the street.

"We again detail the facts. Before the buildings were erected, with a knowledge and concurrence of the owner, the city instructed its agent to investigate and report to the council its rights in the land. The agent did investigate, and reported that the city had no claim or title. This report was received, placed on file, and entered in substance upon

the minutes of the proceedings of the council. Nothing more was ever done by the city until this action was brought, a period of twenty years later. Upon the reception of the report, and its filing among the records of the city, defendants' grantors at once proceeded to the erection of a large and valuable building, and there it stands at the present day. A judgment for plaintiff would result in a destruction of this property. These facts are potent in themselves, and in our researches we have found no case which may so well be termed an 'exceptional case'. We have found no case which with better reason should form a 'law unto itself'. It is a case where an estoppel *in pais* is properly pleaded.''

The unusual circumstances in this case would require the application of the doctrine announced in the *City of Los Angeles* v. *Cohn, supra,* even though no such precedent existed. Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention. ''It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.'' (*Humboldt Sav. Bank* v. *McCleverty,* 161 Cal. 285 [119 Pac. 82], citing Story's Equity Jurisprudence, secs. 28, 439; 1 Pomeroy's Equity Jurisprudence, sec. 60.)

Commenting upon Lord Hardwicke's statement as to the equitable principles which should govern chancellors (Pomeroy's Equity Jurisprudence, 1, fourth ed., note to section 60), the learned author makes the following observation: '' . . . No chancellor was ever more governed in his judicial work by principles—but he would guard against the theory which locks these principles up in the already existing precedents, and limits their free application to facts, circumstances and relations similar to those which had been the subject-matter of former adjudications. In other words, Lord Hardwicke in this short passage states the same view which I had given in the text. Although equity is and long has been in every sense of the word a system, and although it is impossible that any new principles should be added to it, yet the truth stands and always must stand that the final object of equity is to do right and justice.'' The principles of equity, continues the same author, are based

upon a Divine morality and possess an inherent vitality and a capacity of expansion, so as ever to meet the wants of a progressive civilization. It is upon this doctrine that the decision herein is given.

■ It cannot be contended that petitioner raised for the first time the issue of equitable estoppel in its petition to this court. While the question of estoppel was not elaborated upon at length in the lower court, as was the objection that the provisions of section 1255a of the Code of Civil Procedure barred respondents' right of abandonment, nevertheless petitioner did upon the hearing of the motion to abandon state as an objection to the dismissal that "All the time the City taking various steps, indicating that the matter would go through, that the case would not be abandoned, and now at this stage of the proceeding, the City undertakes to abandon the proceeding.

"I have not recited by any means all of the circumstances in the way of councilmanic action, city official action, Board of Supervisors' action, action of the representatives of the city, including the Governor, to indicate that the action would not be abandoned. I have just mentioned a few to your Honor, in order that our position might be understood."

All of the proceedings had in the cause were before the court as the cause was still pending and the court had access to its own records. The fact that the judge who presided at the first trial did not preside when the case came before the court to be retried did not alter the situation.

■ There can be no doubt as to the sufficiency of the pleading in estoppel. Many of the matters therein alleged are material either as substantive matter or as tending to show the convincing effect they must have had upon the petitioner as evidencing a determined, unwavering purpose on the part of the city and the county to acquire its property as a part of a settled plan in conformity with the resolutions, ordinances and statements made by said city and county and their agents, and, finally, by the filing of the complaint on December 21, 1931. At no time was there a suggestion of the possibility of abandonment, but at all times and upon all occasions whenever the project was discussed it was treated as a foreclosed matter. In fact, properties adjoining petitioner's property, and within the

area of the civic center, were either purchased or acquired by condemnation. The acquisition of said properties without the acquisition of petitioner's property to complete the plan and design of the civic center has brought about an incongruous situation never contemplated by anyone.

The court will take judicial notice of the location of the state building in which it holds its sessions, and also of the location of the city hall, important streets, such as Broadway and First and of public buildings generally. The Times-Mirror Company's new building, a massive structure, is in close proximity and plain view of the city hall, the state building, courthouse and other public buildings. It was in the course of construction for many months in anticipation of forced removal from its old building. Notwithstanding the many conferences and communications with the president and manager of petitioner by the city and county and their agents, and without the slightest suggestion given to petitioner that there was a remote possibility of the abandonment of the plan, petitioner was led to believe that the taking of its property must inevitably ensue. We do not mean to say that the city or its agents or any of the parties promoting the project acted in bad faith or wilfully intended to mislead the petitioner. In fact it was the sincere enthusiasm with which the project was carried forward that inspired all with confidence that the completion of the plan was certain. This, however, does not remedy the damage suffered by petitioner. Petitioner had no part in the fortuitous circumstances which seemed to have been the cause of the dismissal of the action on the day it was called for retrial.

Respondents have made as a part of their answer the initiative petition repealing the ordinances authorizing said condemnation proceedings; also a number of protests signed by certain individuals and civic bodies. Said initiative petition was filed in July, 1934, and said protests were made in June and July, 1934, after the completion of petitioner's new building. We have not been advised that an initiative petition may abrogate a legal right accrued before said proposed repealing initiative ordinance was adopted.

It unquestionably appears from the foregoing that petitioner in good faith constructed the new building upon the understanding that the site of the old building was included in the civic center plan and it was necessary from the nature

of the business in which it was engaged that it should prepare in due time to relocate its plant. That it was justified in so concluding and that the city is bound by the rules of equity to prosecute said condemnation causes to final judgment seems wholly within the realm of reason. There is no reason to believe that an unreasonable or unjust appraisal of said properties will be assessed by the court trying the cause, or grounds to fear that an unconscionable sum would, if assessed, be permitted to stand.

Our decision, based on the ground of estoppel, is determinative of petitioner's right to have the trial proceed. This makes it unnecessary to decide the very important question discussed by both sides as to the proper construction of section 1255a of the Code of Civil Procedure and kindred sections in cases where the notice of abandonment is not filed within thirty days after the interlocutory decree is filed, notwithstanding the fact that the condemnee brought about a reversal of the case upon an appeal taken which raised only the issue of compensation. The petitioner contends that the thirty-day period, reckoned from the filing day of said decree, was intended by the legislature to limit the condemnor's right to abandon the cause under any and all circumstances; while, on the other hand, the respondents contend that the section means that the interlocutory decree must be a valid and subsisting one, unaffected by a reversal.

It is not necessary to go further into the arguments of counsel in this cause, as there is now pending in this court causes which present the question of abandonment and the effect that an appeal may have upon it. We, therefore, reserve our decision on this issue for such time as the question may be squarely presented in said causes.

The petitioner is entitled to the issuance of a peremptory writ of mandate compelling the respondent Superior Court of the State of California, County of Los Angeles, to proceed with the trial of said condemnation proceedings entitled *"The City of Los Angeles, a Municipal Corporation,* v. *L. W. Klinker, The Times-Mirror Company et al., defendants,"* No. 332,649 and *"The City of Los Angeles, a Municipal Corporation, Plaintiff,* v. *The Times-Mirror Company et al., Defendants",* No. 332,650, as consolidated.

It is so ordered.

Rehearing denied.