[Nos. B083679, B086822. Second Dist., Div. Four. Feb. 29, 1996.]

LOS ANGELES UNIFIED SCHOOL DISTRICT OF LOS ANGELES COUNTY, Plaintiff and Respondent, v.
TRUMP WILSHIRE ASSOCIATES, Defendant and Appellant.

1684

## COUNSEL

Hill, Farrer & Burrill, Kevin H. Brogan, Jennifer L. Pancake and Dean E. Dennis for Defendant and Appellant.

O'Melveny & Myers, James W. Colbert III, George R. Phillips, Jr., and Edward J. Szczepkowski for Plaintiff and Respondent.

## OPINION

**VOGEL (C. S.), P. J.**—This case involves the decision of the Los Angeles Unified School District of Los Angeles County (the District) to condemn the Ambassador Hotel property, and its later decision to abandon the condemnation in the midst of the decline in commercial real estate values in Southern California. In the interim, the owner of the property, Trump Wilshire Associates, was forced to delay plans for development—plans which may now be impossible to revive. Trump Wilshire appeals the denial

of its motion to set aside the abandonment and its motion for damages based on dispossession. We agree with the trial court that these motions lacked the requisite factual support and affirm.

## FACTUAL BACKGROUND

On July 16, 1990, the District filed a complaint in condemnation to acquire the parcel of real property located at mid-Wilshire in Los Angeles on which the Ambassador Hotel lies. The hotel had been closed in 1989. The entire site consists of some 23.48 acres. The District sought to obtain only the southerly 17.11 acres. Appellant Trump Wilshire had acquired the property in 1989 with the announced intention of transforming it into a world-class hotel and constructing a mixed use development. At the time of the announced condemnation, the development was in the preliminary planning stages—Trump Wilshire had hired planning consultants, a development staff, and an architectural firm to begin the design. It had also set a planning schedule, prepared development budgets, and started the necessary environmental assessment. Once the complaint was filed, these efforts ceased and the development staff moved from the property. The only use made of the property during the condemnation proceedings was pursuant to short term leases for parking and film shoots which resulted in income of approximately $1 million per year, leaving the owner with a $1.1 million annual deficit.

On August 2, 1990, the District deposited $47,919,000 into court as the amount of probable compensation under section 1255.010 of the Code of Civil Procedure.[1] Trump Wilshire initially moved to strike the deposit on the ground it had been illegally transferred from the District's Workers' Compensation Insurance Fund. When that failed, it applied to withdraw the funds in order to pay off its lender on a note secured by a deed of trust. The loan, in the amount of $45,419,000, was accruing interest at the rate of $14,932.29 per day, and was due on September 13, 1992. In January of 1991, Trump Wilshire withdrew the $47,919,000 deposit for the benefit of its lender.[2]

---

[1]Unless otherwise specified, all statutory references are to the Code of Civil Procedure. Section 1255.010 states in pertinent part: "At any time before entry of judgment, the plaintiff may deposit with the State Treasury the probable amount of compensation, based on an appraisal, that will be awarded in the proceeding." Section 1263.110 provides that the date of valuation for purposes of determining the fair market value of the property is the date on which the deposit is made, "[u]nless an earlier date of valuation is applicable under this article . . . ."

[2]Interest earned on the sum during the six-month period it was on deposit with the court was paid to the District.

At first, the lender objected to the withdrawal of the funds due to concerns about the possibility that the District would look to it for repayment if the condemnation action were to be abandoned. In its papers filed in the trial court, the lender outlined the source of its apprehension: "This concern has become more acute with the public pronouncement by Trump's attorney, reprinted in the *Los Angeles Times* on January 12, 1991, that Trump will seek at least $200 million for the property—an amount almost five times that which the LAUSD seems prepared to pay. . . . If there is a $200 million valuation judgment, the LAUSD may be forced to abandon this condemnation proceeding." To assuage those concerns, the parties executed and filed with the court a stipulation which provided that the District would not seek to recover from the lender in case of abandonment, and also provided: "In the event that the School District files and serves a written notice of abandonment pursuant to C.C.P. section 1268.510(a), judgment shall be entered dismissing the proceeding pursuant to C.C.P. section 1268.510(c), and said judgment shall reflect that pursuant to C.C.P. section 1255.280(a), the School District is entitled to repayment from Trump of the total amount of the Deposit less any costs that Trump is entitled to be compensated for under C.C.P. sections 1268.610 and 1268.620 and whatever other rights or remedies the Court should deem appropriate."

Little progress was made in the case between 1991 and 1993. Status conferences and pretrial conferences were conducted; mandatory settlement conferences and, at one point, a trial date were set and then continued. The parties were apparently pursuing settlement, but in March of 1993, negotiations broke down. In April, Trump Wilshire moved pursuant to section 1255.460[3] for an order compelling the District to take possession of the property. The District opposed on the ground that the statute was for the benefit of the condemner, and did not authorize the condemnee to force the condemner to take possession against its will. The District further indicated that it was financially incapable of maintaining and securing the property pending initiation of construction. The County of Los Angeles, requesting permission to intervene, also objected based on the resulting loss of over $700,000 per year in property taxes if the District took possession. The motion was denied, the court finding "no statutory authorization for granting the motion."

---

[3]Section 1255.460 provides in relevant part: "Upon ex parte application, the court shall make an order authorizing the plaintiff to take possession of the property if the court determines that the plaintiff has deposited probable compensation . . . and that each of the defendants entitled to possession has done either of the following: [¶] . . . [¶] (2) Withdrawn any portion of the deposit."

In June of 1993, Trump Wilshire moved the court to set a trial date. However, the motion was filed in the wrong department, and apparently taken off calendar.

On November 10, 1993, the District filed a notice of abandonment. Trump Wilshire made a motion to set aside the abandonment pursuant to section 1268.510, subdivision (b).[4] It referenced numerous public representations by members of the school board of their firm intention to go through with the condemnation. Trump Wilshire contended that it suffered detriment by withdrawing the deposit and ceasing all development efforts. As proof of its inability to be restored to substantially the same position as if the proceeding had not been commenced, it pointed to the declining commercial real estate market and contended that it could not get a loan to commence development in the 1993 market, or even procure a loan comparable to the loan in place at the time of the commencement of the action to repay the withdrawn deposit funds. It also asserted that the District still desired the property and that its abandonment represented a scheme to get title through foreclosure of a judgment lien if the deposit was not repaid. In a transcript of a hearing before the State Allocation Board, put in evidence by Trump Wilshire in support of its motion to set aside, counsel for the District admitted that the reason for the abandonment was the fact that the property had declined in value since the action was filed, and further admitted that it was unwilling to proceed to judgment based on the 1990 value. In addition, an opportunity had arisen to purchase a 24-acre cleared site, closer to downtown, for the lesser sum of $30 million. Comments made by the District's representative at that hearing and by District Board of Education member Jeff Horton to the media indicated that the District still desired the Ambassador site and hoped to obtain it in the future.

The District opposed the motion to set aside the abandonment on the grounds that there was no evidence of detrimental reliance and that the parties' stipulation governed what was to happen in the event of abandonment—that "judgment shall be entered" in favor of the District. The trial court ruled in favor of the District stating in its order: "Pursuant to the stipulation of February 8, 1994, regarding abandonment of the subject property, the Court does not see that said stipulation contemplates any other procedure for entry of judgment than that provided for by the Code of Civil Procedure."

---

[4]Subdivision (b) of section 1268.510 provides: "The court may, upon motion made within 30 days after the filing of [notice of abandonment], set the abandonment aside if it determines that the position of the moving party has been substantially changed to his detriment in justifiable reliance upon the proceeding and such party cannot be restored to substantially the same position as if the proceeding had not been commenced."

Subsequent to entry of judgment, Trump Wilshire sought compensation pursuant to section 1268.620[5] on the ground that it had effectively moved from the Ambassador site. This motion, too, was unsuccessful, the court "find[ing] the legislative intent of 1268.620 CCP is to require dispossession of the defendant." Trump Wilshire appeals the denial of its motion to set aside the abandonment under section 1265.510, subdivision (b), and the denial of its motion for compensation under section 1268.620.

I

█ Section 1268.510, subdivision (a), gives to the condemner the power to abandon condemnation proceeding "[a]t any time after the filing of the complaint and before the expiration of 30 days after final judgment . . . ." This statute provides the condemner with "broad, unconditional and long-term power . . . to abandon at any time before the expiration of 30 days after final judgment . . . ." (*Community Development Com.* v. *Shuffler* (1988) 198 Cal.App.3d 450, 460 [243 Cal.Rptr. 719].) " ' "[U]nless the condemnor has done some additional act which would estop him, he can abandon with near impunity." ' " (*Id.* at p. 460; *City of Torrance* v. *Superior Court* (1976) 16 Cal.3d 195, 203-204 [127 Cal.Rptr. 609, 545 P.2d 1313].)

Section 1268.510, subdivision (b), provides the only limit on that power. Under subdivision (b), "[t]he court may . . . set the abandonment aside if it determines that the position of the moving party has been substantially changed to his detriment in justifiable reliance upon the proceeding and such party cannot be restored to substantially the same position as if the proceeding had not been commenced."

Subdivision (b) of section 1268.510 was not intended to be a substitute for pursuit of an inverse condemnation claim for monetary damages. As the court said in *Redevelopment Agency* v. *Heller* (1988) 200 Cal.App.3d 517 [246 Cal.Rptr. 160], in which the trial court's dismissal of an eminent domain proceeding over the opposition of the condemnee was affirmed: "Appellant in this case does *not* seek to require respondent to take his property. Rather, appellant seeks to recover *damages* . . . for allegedly unreasonable *precondemnation* conduct and delay by respondent. . . . Although such damages could properly have been reflected in an award of just

---

[5]Section 1268.620 provides: "If, after the defendant moves from property in compliance with an order or agreement for possession or in reasonable contemplation of its taking by the plaintiff, the proceeding is dismissed with regard to that property for any reason or there is a final judgment that the plaintiff cannot acquire that property, the court shall: [¶] (a) Order the plaintiff to deliver possession of the property to the persons entitled to it; and [¶] (b) Make such provision as shall be just for the payment of all damages proximately caused by the proceeding and its dismissal as to that property."

compensation in an eminent domain action which proceeded to final judgment with the condemning agency acquiring the property, recovery of such damages cannot be achieved in the eminent domain proceeding when the condemning agency has exercised its right to abandon the proceeding. In order to recover such damages now, appellant must file an inverse condemnation action." (*Id.* at pp. 519-520, original italics.)

Prior to the enactment of the predecessor to section 1268.510 subdivision (b), the condemner's power to abandon an eminent domain action was unchecked by statute. The courts had recognized a limited exception where, in reliance on the condemnation action, the property owner relocated its business to a new property and would have suffered substantial hardship if the abandonment were allowed to stand. (*McGee* v. *City of Los Angeles* (1936) 6 Cal.2d 390 [57 P.2d 925]; *Times-Mirror Co.* v. *Superior Court* (1935) 3 Cal.2d 309 [44 P.2d 547].) In that situation, the condemner was said to be estopped to abandon the eminent domain action.

The enactment of the statutory limitation on the power of abandonment in 1961 was prompted by the same concern for the plight of the property owner who relocates his business in reliance on the condemnation expressed in *Times-Mirror* and *McGee*. As explained in the Recommendation of the Law Revision Commission: "Under existing law, even though the condemner has taken possession and constructed the contemplated improvement on the property, the condemner may abandon the proceedings at any time until 30 days after final judgment and get back the money it deposited. It is true that the condemner must compensate the owner for the use of the property and any damage to it. But the land owner who has been forced to give up his home or his business and to relocate in another area may find that it is as great a hardship to be forced, in effect, to buy back the original property as it was to be forced to move initially. The deposit may have been withdrawn and expended in the acquisition of a new location; the good will of the business may have been re-established in the new location; or the original property may be so altered that it is no longer useful to the condemnee." (Recommendation and Study Relating to Taking Possession and Passage of Title in Eminent Domain Proceedings (Oct. 1960) 3 Cal. Law Revision Com. Rep. (1961) p. B-9.)

Although the impetus for the enactment of the statute may have been concern for the property owner who has relocated, the Supreme Court has recognized that the statutory language is not limited to cases involving dispossession and accordingly held that subdivision (b) should not be interpreted to contain such a limitation. In *City of Torrance* v. *Superior Court*,

*supra*, 16 Cal.3d 195, the court explained: "The available legislative history . . . suggests that situations involving immediate possession . . . were foremost in the mind of the Legislature at the time. However, certain broad language in the Recommendation and Study . . . , and more especially the comprehensive and general terms of the enactment itself, convince us that a broader legislative purpose was here operative. If it had been the intention of the Legislature merely to insure that the principles of equitable estoppel applied in *Times-Mirror* not be foreclosed from operation in cases involving orders of immediate possession, it could easily have so stated. Instead it adopted a general principle, based on considerations of equity, which was clearly designed to be applied in a broad range of circumstances not limited to those involving immediate possession by the condemnor." (16 Cal.3d at pp. 203-204, fn. omitted.) The aggrieved party in *City of Torrance*, a developer, had not been dispossessed. Indeed, just the opposite had occurred, the representations of the City had led it to purchase and take possession of property adjoining a parcel of its own on which partial condemnation proceedings had been commenced for the purpose of constructing a street. It then prepared plans integrating the two properties, designing around the portions subject to condemnation. Engineering, grading, and installation of utilities had all been commenced when the City abandoned the eminent domain action, hoping to acquire the strips of property at no cost as a condition of approval of the plans. ■ Under those facts, the court found the presence of the two essential elements of section 1268.510, subdivision (b): "that the moving party (1) has substantially changed his position 'to his detriment in justifiable reliance upon the proceeding,' and (2) 'cannot be restored to substantially the same position as if the proceeding had not been commenced.'" (16 Cal.3d at p. 206.)

Applying this two-pronged test to the facts present here, the drastic change in the Southern California commercial real estate market is a factor suggestive of the inability to restore Trump Wilshire to the same position it held in 1990. The element of detrimental reliance, however, is completely lacking. In the declaration in support of the motion to set aside the abandonment, Trump Wilshire provided a long list of public statements made by members of the school board at hearings and to the media about their commitment to the project, but did not state that Trump Wilshire was aware of or relied on these statements when made. Nor did it identify any action taken in detrimental reliance. True, there was a cessation of development operations. According to the declaration, this occurred not as a result of the District's representations, but as a result of the initial notice of condemnation. Thereafter, Trump Wilshire did nothing to change its position throughout the course of the litigation—e.g., purchasing other nearby property to

proceed with its plans as in *Times-Mirror* and *McGee*, or undertaking development of the remainder of the property as in *City of Torrance*. It simply did what every other owner of property must be expected to do when faced with the possibility of its loss through condemnation: put a hold on long-term plans involving the property pending the outcome of the litigation. In all eminent domain cases, the property owner is foreclosed from making future plans until the action is resolved. And, most surely, the fluctuations in the real estate market play no part in what the property owner may do or not do, however much they may influence the decision of the condemner to proceed with or abandon the taking. The owner's remedy is to take advantage of statutory provisions entitling it to trial setting preference. (See § 1260.010.) Subdivision (b) of section 1268.510 applies only in the relatively rare situation where the property owner affirmatively alters its position after receiving assurances that the condemnation action will not be abandoned.

Trump Wilshire suggests that the withdrawal of the deposited funds is indicative of detrimental reliance. The funds were used to pay off a 12 percent loan on the subject property accruing interest at the rate of $14,000 per day or, by our calculation, over $5 million per year. It is difficult to conceive how a savings of $5 million per year in interest charges can be described as a "detriment." Trump Wilshire contends that it will be unable to find refinancing in the current market. Even if that is true, it is not indicative of a detrimental change in position. Trump Wilshire did not give up long-term financing when it used the deposit to pay off the existing loan, and would have faced the identical problem in September of 1992 when that loan expired.

Additional basis for upholding the trial court's denial of the motion to set aside the abandonment can be found in the terms of the parties' stipulation. At the time they entered into the stipulation, the parties recognized that if the valuation judgment came down near the amount that Trump Wilshire was demanding, the District would abandon after judgment. Accordingly, the parties entered into a stipulation to govern "the procedure that will be followed by the parties in the event that the School District files a Notice of Abandonment in this action pursuant to C.C.P. section 1268.510(a)." "In the event that the School District files and serves a written notice of abandonment pursuant to C.C.P. section 1268.510(a), *judgment shall be entered dismissing the proceeding pursuant to C.C.P. section 1268.510(c)*, and said judgment shall reflect that pursuant to C.C.P. section 1255.280(a), the School District is entitled to repayment from Trump of the total amount of the Deposit less any costs that Trump is entitled to be compensated for under

C.C.P. sections 1268.610 and 1268.620 and whatever other rights or remedies the Court should deem appropriate." (Italics added.) The parties' intent that, on abandonment, judgment be entered awarding the District repayment of the deposited funds is unambiguously expressed.

Trump Wilshire makes much of the fact that, according to the stipulation's language, judgment is to be "entered . . . pursuant to C.C.P. section 1268.510(c) . . . ." Because section 1268.510 subdivision (c) refers to entry of judgment "[u]pon denial of a motion to set aside . . . abandonment or, if no such motion is filed," Trump Wilshire contends this means the parties expected a motion to set aside the abandonment to be filed. We do not read the stipulation that way. We interpret the stipulation's reference to judgment being entered under subdivision (c) once a notice of abandonment is filed under subdivision (a) to mean that once the District files its notice of abandonment, judgment is to be entered *as if a motion to set aside had been denied or not been filed*. In denying Trump Wilshire's motion to set aside the abandonment, the court gave effect to the parties' stipulation.

## II

■ Trump Wilshire also appeals from the denial of its motion for damages under section 1268.620. Unlike the broader provisions of section 1268.510, subdivision (b), section 1268.620 is expressly limited to the situation where "the defendant moves from property in compliance with an order or agreement for possession or in reasonable contemplation of its taking by the plaintiff . . . ." According to the Law Revision Commission Comment, "[s]ection 1268.620 provides for *restoration of possession of the property* and damages *where the defendant was dispossessed from property* prior to a dismissal or a final judgment that the plaintiff cannot acquire the property." (See Cal. Law Revision Com. com., Deering's Ann. Code Civ. Proc., § 1268.620 (1981 ed.) p. 408, italics added.) The legislative intention that the remedies available under section 1268.620 be applied only to parties who have been physically dispossessed is confirmed by the Report on the Subcommittee on Eminent Domain, which stated when enacting the present version of the statute in 1975: "Where the condemnor takes possession of property to be condemned and subsequently abandons the condemnation action, the condemnor must redeliver possession of the property and pay damages arising out of its taking and use of the property, along with damages for any loss or impairment of value suffered by the land and improvements. [¶] Subdivision (b) of Section 1268.620 requires the condemnor in such a situation to pay 'all damages proximately caused by the proceeding and its abandonment.' This provision in effect would require

additional compensation not now required for such damages as temporary interference with the operation of a business." (Rep. of Subcommittee on Eminent Domain, Analysis of Assem. Bill No. 11, pp. 13-14.)

Trump Wilshire argues it was effectively dispossessed by the pendency of the action because it was unable to proceed with its development plans. We find no merit to that contention. As we have noted, everyone whose property is the subject of an eminent domain action is well advised to make no plans for extensive renovations or improvements until the action is resolved. If inability to develop the property were the criterion, then section 1268.620 damages would be available in every case, clearly not what the Legislature intended. Throughout the litigation and despite its efforts to transfer possession to the District in 1993, Trump Wilshire continued to exercise ownership control over the property and to derive substantial income from it.[6] Under the circumstances, the denial of the request for damages pursuant to section 1268.620 was appropriate.

## DISPOSITION

The judgment entered February 17, 1994, and postjudgment order denying motion for damages pursuant to section 1268.620 are affirmed. Pursuant to section 1268.720 of the Code of Civil Procedure, costs are awarded to Trump Wilshire.

Hastings, J., and Rubin, J.,* concurred.

A petition for a rehearing was denied March 29, 1996, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 15, 1996.

---

[6]We note for example that prior to entering onto the property for the purpose of conducting necessary environmental tests, the District had to obtain a stipulation signed by Trump Wilshire and order pursuant to section 1245.030.

*Judge of the Municipal Court for the Santa Monica Judicial District sitting under assignment by the Chairperson of the Judicial Council.