[L. A. No. 9258. In Bank.—March 8, 1929.]

LEO J. MUCHENBERGER et al., Plaintiffs and Appellants, v. THE CITY OF SANTA MONICA (a Municipal Corporation) et al., Defendants and Appellants; SANTA MONICA LAND COMPANY (a Corporation), Respondent.

Black, Hammack & Black and James Westervelt for Plaintiffs and Appellants.

Chester L. Coffin, City Attorney, for Defendants and Appellants.

Newlin & Ashburn for Respondent.

WASTE, C. J.—Respondents, as citizens of the state of California, and as residents and citizens of the City of Santa

Monica, claiming to act in their own behalf and on behalf of others similarly situated, instituted an action in equity against the City of Santa Monica, a municipal corporation, and its officers, and against the Santa Monica Land Company, a corporation, to compel the city, as trustee, to perform the terms of the trust contained in the "Act granting certain tide-lands and submerged lands of the State of California to the City of Santa Monica upon certain trusts and conditions," approved April 10, 1917, and in particular to require the city to cancel a deed and certain permits issued to the land company pertaining to a portion of the tide-lands alleged to belong to the city. The trial court made voluminous findings and conclusions of law, and entered judgment, the general effect of which is to sustain the position of the defendant city, but directing that certain remedial steps be taken in relation to a portion of the lands in question. The plaintiffs and the City of Santa Monica and its officers have appealed. The defendant land company is satisfied with the judgment.

The facts are taken from the findings of the trial court. The boundary of the City of Santa Monica on the west is a line three miles westerly of the line of the mean high tide of the Pacific Ocean. Between the upland of the westerly shore of the city and the line of mean low tide there lies a strand of sand and beach or tide-land, existing along the whole waterfront of the city; and, between the upland and the line of mean high tide, wherever that line may be, lies the land involved in this controversy. Prior to the year 1917 the title to the tide-lands was in the state of California. On the tenth day of April, 1917, the legislature passed an act granting "the tidelands and submerged lands of the state of California within the City of Santa Monica" to the city upon certain trusts. (Stats. 1917, p. 90.) According to the terms of the act, these lands shall be used by the city for the establishment, improvement and conduct of a harbor, for the establishment and construction of bulkheads or breakwaters for the protection of lands within its boundaries, or for the protection of its harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays and other utilities, structures and appliances necessary or convenient for the promotion or accommodation of commerce and navigation "and the pro-

tection of the lands within said city." The absolute right to fish in the waters of the harbor, with the right of convenient access to its waters over the tide-lands for that purpose, is, by the terms of the act, reserved to the people of the state of California.

A public highway, known as Palisades Beach Road, runs southerly, and generally parallel with the shore line of the ocean from the northerly boundary of the City of Santa Monica to the southerly line of the city. The distance between the highway and the existing shore line changes, from time to time, and varies, from place to place, the distances ranging from approximately 150 feet to approximately 350 feet, and the average distance is in excess of 190 feet. In the year 1921 the defendant Santa Monica Land Company owned a strip of upland bounded on the east by the Palisades Beach Road and on the west by the mean high-tide line of the ocean. Since that date much of this land has been sold by the land company to numerous persons who, in due time, have taken possession of their holdings and, in many instances, have placed homes and other valuable improvements on their lots. These persons are not parties to this action.

On or about the fourth day of February, 1921, the defendant Santa Monica Land Company filed with the city a petition requesting the city to grant a permit to the company to erect certain structures, known as "groynes," partly on its own property and partly on the tide-lands lying between its property and the ocean. The officers of the city and the city council deemed it to be for the best interests of the city that the construction of these groynes should be permitted as a means of protecting the harbor and of protecting the lands of the city and carrying out the terms of the grant from the state; but the shifting of the tide line from day to day, due to the action of the tides and waves, caused an uncertainty to exist as to the true location of the mean high-tide line and as to the exact boundary line between tide-lands and the privately owned upland, including that of the land company. For the purpose of removing the uncertainty the city caused surveys to be made, as the result of which a line was laid out by the city engineer, and adopted and designated by the city, by means of an ordinance duly passed, as representing the mean high-tide line

along its westerly shore. This line was arrived at by means of readings taken by the surveyor at stations located 500 feet apart, and checking with other surveys. It was based on the fixed datum plans established by the United States Coast and Geodetic Survey, and the line was made straight in an endeavor to attain the average of a mean high-tide line. While the line, so established by the survey ordered by the city, did not exactly coincide with the mean high-tide line as it varied from day to day, the trial court finds that it is a fair average line, located 190 feet from the Palisades Beach Road, and, as established, it is for the best interests of the city that the same "be upheld and maintained." The mean high-tide line thus located was accepted by the city and by the land company as fixing and making definite and certain the boundary line between the tide-lands of the city and the property of the land company, and for the purpose of protecting the city against any claims which might thereafter be made, or which might otherwise be made by the land company or its successors, that it or they had acquired title by accretion to any land which might be subsequently built up by the maintenance of the groynes and the action of the ocean.

Following the establishment of the mean high-tide line, the City of Santa Monica and the Santa Monica Land Company, by agreement, executed a joint quitclaim deed, the city purporting to convey to the land company the interest of the city in and to all lands lying between the line established by the ordinance and the Palisades Beach Road, and the land company purporting to convey to the city all interest it might have in and to all lands lying westerly, or seaward, of the line established by the ordinance. The land company then proceeded to construct the groynes in accordance with the terms of a permit issued to it by the United States War Department. These structures, approximately 2300 feet apart, are located partly upon upland belonging to the Santa Monica Land Company, partly upon tide-lands to the west of its holdings, and partly in deep water beyond the low-tide line. Since the construction of these groynes, a large amount of accretion has formed north of each of them, and the fluctuating physical high tide-land has, at these points, and by virtue of these accretions, moved seaward for substantial distances, extending over long parcels

of shore line from north to south. These accretions have enured to the benefit of the city by creating a considerable amount of new upland. The groynes erected by the land company are found by the trial court to be permanent structures and to constitute partial obstructions to the free use of the tide-lands; but the obstruction is not greater than was considered by the city as necessary for the protection of its harbor and the protection of lands within the city, except that the outer thirty feet, or seaward end, of the south groyne is found to be unnecessary for the protection of the harbor or lands. The court also found that the construction of the groynes was permitted to be made at the expense of the land company as a means of enabling the city to provide necessary protection for its harbor and land within its limits.

As conclusions of law from the many facts contained in the voluminous findings, the trial court decided that the permits granted the land company for the construction and maintenance of the groynes were acts which were authorized and performed for the purpose of protecting the harbor of the City of Santa Monica and the protection of lands within its boundaries, and were and are proper and lawful means of carrying out the purpose of the grant of the state of California of the tide-lands to the city, and that the groynes are not nuisances or purprestures, and that the plaintiffs were not entitled to have them abated or removed, except that the westerly thirty feet of the south groyne, hereinbefore referred to, should be cut off. But the trial court went further, and, apparently because the groynes in a measure interfere with the approach to and free use of the beach west of the mean high-tide line which had been adopted, and for the purpose of permitting passageways to be constructed on each side of the groynes from the beach to the Palisades Beach Road, directed that the land company convey by quitclaim deed to the city, and the city accept from the land company said groynes and the strips of land on which they are located. Judgment was entered in accordance with the findings and conclusions of law.

The plaintiffs appeal because of the failure of the lower court to cancel the deed from the city to the land company, and to cause the removal of the groynes. The City of Santa

Monica and its present officers appeal from that portion of the judgment whereby the Santa Monica Land Company is ordered to deed to the city, and the city is ordered to accept from the land company, the groynes and the land on which they are located, and from that portion of the judgment which orders the destruction of the thirty feet of the south groyne. The city also contends that it has been prejudiced by a finding, claimed to be without the issues, to the effect that the city is the owner of the lands formed north of the groynes by accretion.

No authorities have been cited by the appealing plaintiffs to the effect that, on facts such as are here found to exist, it is not permissible for a municipality to cause surveys to be made and to arbitrarily fix a line to be accepted as the mean high-tide line. The evidence fully supports the finding that the mean high-tide line to the west of the land company's holdings is a shifting, uncertain line. It is also a matter of common and judicial knowledge that tide lines fluctuate. In *Strand Imp. Co.* v. *Long Beach,* 173 Cal. 765 [161 Pac. 975, 977], this court, speaking through Mr. Justice Shaw, said (p. 770): ''California has more than one thousand miles of seashore to which land is continually being added by alluvion, and from which land is continually being taken away by reliction. The actual line of mean high tide, as it existed when the state was formed, or as it was in 1872, when the Civil Code was enacted, has never been surveyed, and in places where relictions or alluvions have changed the shore line, the original line is unknown and cannot be ascertained with any degree of certainty.''

When owners of adjoining property, being uncertain of the true boundary between their lands, agree upon its true location, mark it upon the ground, or build up to it, occupy on each side up to the place so fixed, and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would be caused by a change of its position, such line becomes in law the true line called for by the respective descriptions, regardless of the accuracy of the agreed location, as it may appear by subsequent measurements. (*Young* v. *Blakeman,* 153 Cal. 477, 481 [95 Pac. 888]; *Silva* v. *Azevedo,* 178 Cal. 495, 499 [173 Pac. 929].) We see no reason why a municipality, as well as any

other owner, may not by agreement determine the boundary line of its property. It seems to be well established by ultimate authority that it may. The legislature of a state "may with great propriety define the bounds of high and low water, . . . for the purpose of regulating a public right, so as not to conflict with private interests, and to prevent private rights from being exercised to the prejudice of public interests." (*Philadelphia Co.* v. *Stimson*, 223 U. S. 605, 630 [56 L. Ed. 570, 32 Sup. Ct. Rep. 340, 349, see, also, Rose's U. S. Notes].) The city, in this case, as a trustee holding the title to the tide-lands, has the same power that the state had to do everything necessary to the execution and administration of the trust. Until the adoption of the ordinance by the city, and the delivery of the quitclaim deed, uncertainty existed as to the true location of the mean high-tide line and as to the exact boundary line between the city's tide-lands and the privately owned uplands. The findings quite clearly indicate that, for that reason, the city council and the city attorney deemed it was essential that the line of mean high tide be permanently fixed, in order to protect the rights of the city, particularly against any claim the Santa Monica Land Company might assert to any alluvion which might be formed by reason of the construction and maintenance of the proposed groynes, or jetties. The court further finds and concludes that the city, in entering into the agreement with the land company for the purpose of setting at rest any and all questions relating to the location of the boundary line between their respective properties, acted for the advantage and best interests of the city. Not only does the evidence appear to support the findings, but the trial judge made a personal inspection of the waterfront, which we must assume further convinced him of the correctness of his views.

As to the maintenance of the groynes, it appears from the evidence and from the findings that these particular structures constitute a well-recognized and generally favored method of protecting the uplands against erosion and other action of the sea and its storms. The primary purpose of their erection is to arrest the shifting sands and hold them, thereby stabilizing the high-tide line. There is evidence that the two here in question were properly placed for the purpose of, and with a view to, protecting the shore line in

front of Santa Monica. ■ While the absolute right to fish in the waters of the harbor, with convenient access to its waters over the tide-lands for that purpose, is, by the terms of the grant from the state, reserved to the people, the lands may also be used for the establishment, improvement and conduct of a harbor, and for the construction and maintenance of structures for the protection of lands within its boundaries. If, in so adapting the tide-lands for this use, it is found necessary or advisable, in aid of the use, to cut off portions of them from access to the waters of the harbor, that may be done. (*People* v. *California Fish Co.*, 166 Cal. 576, 597 [138 Pac. 79].) ■ Therefore, the right of access to the tide-lands must be taken in conjunction with the right of the city to protect and improve the harbor and the lands within the city. The trial court has found that the erection and maintenance of the groynes, except as to the outer thirty feet of the southerly structure, and certain obstructions on the groynes, such as fences and signboards, are in keeping with the powers and duties of the city in the administration of its trust, and that they are necessary and proper for the protection of the interests of the city and its inhabitants; and any obstruction of free access to the waters of the harbor, caused by their maintenance, is not greater than the city council deemed necessary for the protection of the harbor and lands.

■ The plaintiffs, while admitting that the action of the city was "unquestionably taken with the best of faith," decry what they assert to be the practical effects of a transaction amounting to a violation of the terms of the trust upon which the City of Santa Monica holds the . tide-lands within its borders, and characterize the contentions as "sophistry." The appellation is not supported by the record. The fact that the action of the city may have resulted in benefit to the private owners of the upland, and in a manner or to a degree that may not have been foreseen by those charged with the affairs of the city, falls aside the mark in the light of the trial court's findings that the city acted within the scope of its powers, and did not violate the trust imposed on it by the grant of the tide-lands from the state.

■ Another contention of the plaintiffs is that the city has transferred property to the land company, in violation

of the provision of the constitution that tide-lands within cities and fronting on waters used for the purpose of navigation shall be withheld from grant or sale to private persons, partnerships or corporations. (Const., art. XV, sec. 3.) It was not the purpose of the city in this case to transfer any titles, but to mark the boundaries of littoral holdings in order to make them certain and permanent and to prevent questions arising in the future concerning the ownership of lands on either side of the line agreed upon. The purpose and scope of the quitclaim deed plainly appear from the recitals and terms of the instrument. Neither party purports to grant any property or interest to the other. The trial court found that, although an instrument in the form of a quitclaim deed was adopted by the parties, the substance of the transaction was merely an agreement upon an uncertain boundary, and that the deed was made only for the purpose "of fixing and definitely establishing a boundary line which was theretofore uncertain and in doubt and that the said quitclaim deed did not convey any property whatever." That being the fact, the transaction appears to fall within the language used in *Loustalot* v. *McKeel*, 157 Cal. 634, 643 [108 Pac 707, 711], where the court said: "They [agreements of this character] do not operate as a conveyance so as to pass title from one to another, but they proceed upon the theory that the true line of separation is in dispute and to some extent unknown, and in such cases the agreement serves to fix the line to which the title of each extends."

It follows, therefore, that that portion of the judgment of the trial court, by which it refused to cancel the quitclaim deed and annul Ordinance No. 188 of the City of Santa Monica fixing the mean high-tide line between the lands of the city and of the Santa Monica Land Company, and refusing to order the removal of the groynes, must be affirmed.

The City of Santa Monica appealed from that portion of the judgment ordering and decreeing that the Santa Monica Land Company, after making certain structural changes in the groynes, immediately convey to the city the two groynes and the strips of land upon which each is situated, and a strip of land fifteen feet wide, running from the high-tide line as established, across the property

of the land company to the Palisades Beach Road. It also attempted to appeal from a "portion of the findings" relating to certain accretions said to have formed outside the mean high-tide line as established, a matter wholly outside the issues in the case. The respondent land company moved to dismiss the city's appeal upon the ground that an appeal does not lie either from findings or a part of a judgment. ▮ No appeal lies from findings, in whole or in part. But it is well settled that a party may appeal from a specific part of a judgment. (*Ganahl Lumber Co.* v. *Weinsveig,* 168 Cal. 664, 667 [143 Pac. 1025]. See, also, *Lake* v. *Superior Court,* 187 Cal. 116, 119 [200 Pac. 1041], and *Whalen* v. *Smith,* 163 Cal. 360, 362 [Ann. Cas. 1913E, 1319, 125 Pac. 904].) The futile appeal from the finding will, therefore, be disregarded, and the motion to dismiss the appeal from the portion of the judgment which the city deems adverse to it will be denied.

While, apparently, some of the inconvenience to the public through being denied ready access to the beach fronting the land company's land can be relieved in the manner found by the trial court, neither the plaintiffs nor the city want such relief, and the respondent land company seems anxious to grant it. The usual and ordinary way of providing access to the beach would be by agreement between the parties, or by condemnation proceedings instituted by the city to provide streets or passageways, with just compensation paid the private owners of the land taken for such use. ▮ A court sitting in equity, and having taken jurisdiction, has broad powers. It may grant relief as varied and diversified as the means employed to produce the grievance complained of, and is not bound to the strict legal rights of the parties. Such rule has application to controversies between private parties who find themselves in a court of equity, but does it apply when one of the parties is a municipality, and matters of policy and public concern are expressed only in legislative action? Courts of equity may, and sometimes do, interfere and enjoin the action of a municipal corporation acting or proposing to act in excess of jurisdiction and without authority. It has no authority to interfere with the legislative or governmental acts within the scope of the city's authority. (*Glide* v. *Superior Court,* 147 Cal. 21, 24

[81 Pac. 225].) ■ The contention of the city is that the matter of acceptance of property is within the legislative discretion of the city council. Beyond the suggestion that ownership of the strips of land and the groynes might conceivably carry burdens which would militate against the acceptance of a deed thereto, counsel for the city requests that the court "will not call for reasons for the unwillingness of the city to accept" the conveyance in this instance. We are as little concerned about such reasons as we are about the reasons for the land company's anxiety to have the city accept the property. The attitude of the parties clearly indicates that matters of policy and public concern may enter largely into this phase of the controversy.

The Civil Code provides (sec. 1158) that deeds, or grants conveying real estate, or any interest therein, or easement thereon, for public purposes to a political corporation or governmental agency, shall not be accepted for recordation without the consent of the grantee, evidenced by its resolution of acceptance attached to such deed or grant. We question the power of the court to force the city council, in which the legislative power of the City of Santa Monica is vested by its charter, to pass any such resolution of acceptance. The acceptance of the strips of land and the groynes, and their subsequent maintenance by the city, are unquestionably powers of the municipality. (See *Harbor Center Land Co.* v. *Council of Richmond,* 38 Cal. App. 315 [176 Pac. 50].)

We are of the view that, as to the conveyance directed to be made, a case for the intervention of the strong arm of equity was not made out.

The motion of the Santa Monica Land Company to dismiss the appeal of the City of Santa Monica is denied.

That portion of the judgment directing a conveyance of the strips of land, describing them, and the two groynes, is reversed. In all other respects the judgment is affirmed.

Shenk, J., Curtis, J., Preston, J., Richards, J., Seawell, J., and Langdon, J., concurred.