## CITY OF LOS ANGELES v. BORAX CONSOLIDATED, Limited, et al.

### No. 8822.

Circuit Court of Appeals, Ninth Circuit.

Feb. 14, 1939.

Rehearing Denied March 21, 1939.

Ray L. Chesebro, City Atty., and Loren A. Butts, Sp. Counsel, both of Los Angeles, Cal., for appellant.

Newlin & Ashburn, of Los Angeles, Cal. (A. W. Ashburn, of Los Angeles, Cal., of counsel), for appellees.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

WILBUR, Circuit Judge.

This is a second appeal in an action brought by the City of Los Angeles as owner of the tide lands in the Inner Bay of San Pedro by grant from the State of California, to quiet title to that portion of Mormon Island in said harbor lying below the level of mean high tide.

Mormon Island was granted to William Banning by patent of the United States in 1881. The boundary lines in the patent of the Island were fixed according to a survey made by W. H. Norway in 1880 for the Surveyor General of the United States.

The principal controversy upon the first trial was whether or not the lines of the Norway survey enclosing Mormon Island were boundary lines or meander lines. On the first appeal (9 Cir., 74 F.2d 901) we held that the lines were meander lines and that the property conveyed by the United States patent to Banning was the land of Mormon Island above the mean high tide line. Our decision, directing the lower court to retry the case and determine the location of the mean high tide line and to take such proceedings as were not inconsistent with our opinion, was affirmed by the Supreme Court. 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9. In our former decision,

we held that the line of mean high tide was to be determined by an average of mean high tides for 18.6 years. On the retrial the court fixed the elevation of mean high tide at 4.7 feet above the mean of the lower low tides. The latter constituted the datum plane for the surveys of the Coast and Geodetic Survey and the Army Engineering Corps of surveys of the harbor and shore lines. This 4.7-foot contour as fixed by the trial court excluded most of the land included within the lines of the Norway survey.

Upon a retrial of the case, the trial court held that notwithstanding the fact that most of the land involved was tideland, the City of Los Angeles had so conducted itself in connection with the purchase and improvement of the land by appellees that it was estopped from asserting the basic and sovereign title of the state to the tide lands claimed by the appellees. That court also found that the conduct of the city in its dealings with the appellees was such as amounted in effect to an agreement fixing the boundary line of the property. On the prior appeal this court declined to consider the question of estoppel in view of the fact that the question was not presented to or considered by the trial court.

It should be stated here that although the appellees were successful in the lower court in defending their right to the lands within the lines of the Norway survey upon the ground that the City was estopped from claiming such lands were tide lands, they also contend that the line of the high tide was not correctly located by the trial court, and that the court should have decided that all the land involved in the action was above the line of mean high tide in 1881 at the time of the Banning patent. Therefore, we are asked by the appellees to find as a fact that the lands here involved are not tide lands.

We will first deal with the question of estoppel upon which the trial court predicated its findings and decree.

The People of the State of California, in 1908, brought an action against William Banning and others to quiet its title to the tide lands surrounding Mormon Island. This action was numbered 64,540 and was filed in the Superior Court of the State of California in and for the County of Los Angeles wherein it was claimed by the People of the State of California that of the 18.88 acres enclosed in the lines of the patent issued to Banning in 1881, all but about three acres thereof were tide lands belonging to the State of California by virtue of its sovereignty. This action was dismissed on August 16, 1917. Before such dismissal, however, the case had been tried and submitted to the court for over a year, the submission had been set aside and further hearing of the cause had been postponed from time to time, altogether for a period of four years. On October 20, 1915 it was stipulated that the case go off the trial calendar. The pertinent facts pertaining to the dismissal in 1917 are as follows:

A number of other suits affecting the tide lands in the Bay of San Pedro were brought at about the same time. See statement of facts in People v. California Fish Co., 166 Cal. 576, 138 P. 79. Among other suits was one against William Banning and others to quiet title to property which had theretofore been patented to him by the state of California, involving 345.12 acres of tide land known as tide land location No. 152. The state claimed that this patent was void. The Supreme Court of California in People v. Banning Co., 166 Cal. 635, 138 P. 101, held that the state patent was not invalid but that the right conveyed thereby was subject to the easement of the state for purposes of navigation and fishing. Because of a dispute between the parties as to the effect of this decision, the parties negotiated for a settlement of the title and agreed upon the plan of a conveyance from Banning to the City of all his interest in location No. 152 in exchange for which he received a lease of the property for thirty years. This tide land location lay immediately north of the 18.88 acres included in the lines of the Norway survey. It was made a condition of the settlement with reference to the tide land location No. 152 that the action brought by the People of the State of California to quiet title to lands claimed as tide lands lying within the exterior boundaries of the lines of the Norway survey should be dismissed. This compromise agreement for the adjustment of title to tide land location No. 152 and for the dismissal of the action No. 64,540 was in writing and was submitted to the City Council of the City of Los Angeles and its execution approved by ordinance. The ordinance provided for the dismissal "in the appropriate manner" of action No. 64,540.

The contract or agreement provided for the "dismissal" of the action. In pursuance of this contract the deed and a lease were executed to tide land location No. 152 as therein agreed and action No. 64,-540 was dismissed. In effecting a dismissal the attorneys for the People of the State of California and for the City of Los Angeles, and the attorneys for the defendants, filed with the clerk of the state court a document addressed to the clerk, which stated: "You will enter the dismissal of the above entitled action without prejudice." The clerk entered this into the register. The attorneys immediately went before the court and moved for a dismissal without prejudice. An order was entered in the minutes of the court dismissing the action "without prejudice". Subsequently, on the same day, and to effectuate the dismissal, the court signed an order dismissing the action but did not incorporate therein the words "without prejudice". The description of tide land location No. 152 in the deed and lease where it adjoins Mormon Island follows the calls of the line of Mormon Island according to the Norway survey.

In 1909 dredging and filling operations were begun on the island whereby the land here involved was covered to a depth of about six feet with material dredged from the channels of the Bay, thus obliterating all physical evidence as to the location of the mean high tide lines. At the time of the purchase of the property by the appellees it had been improved with buildings and railroad tracks. The appellees rely upon the actions of the Board of Harbor Commissioners (in charge of harbor affairs and tide lands, See Charter of Los Angeles, § 139, Stats.Cal.1925, p. 1072), in connection with the purchase and improvement of the property by appellees as estopping the city from now claiming the land as tide land. It is claimed that the conduct of the city would operate as a fraud upon appellees if the city were now permitted to assert title to the land and improvements.

During March 1921 the representative of appellees held a conference with the Board of Harbor Commissioners and with the assistant city attorney who was acting as its attorney. The members of the Board were all present and the appellees' representative wanted to ascertain whether there would be any objection to the construction and operation of private wharves on private land. He was told there would be no objection to that. He asked for a confirmation and after the meeting the city attorney, by the assistant city attorney acting in harbor matters, advised the representative of the appellees by letter in effect that the property in question was private property. The letter stated, among other things: "I wish to advise you that the records show the northwesterly boundary line of Mormon Island as patented [the Norway line] lies behind the United States pier head line excepting for a distance of 350 feet at the northerly end where the private property line [the Norway line] extends outside the government pier head line. At the points where the private property extends to or beyond such pier head line it is my opinion that the private owner could build to the pier head line and use the property for private purposes without objection on the part of the city but could not use the same for public purposes without obtaining franchise therefor. At the points where the party boundary of the island [the Norway line] does not extend to the pier head line of property between the party boundary and the pier head line is owned by the city and permission to use the same would have to be obtained in the regular way."

In 1922 the appellees secured an option to purchase the land here in controversy from one Ralph Chandler. The option was later exercised and a deed conveying the property to Borax Consolidated, Ltd., dated April 24, 1923, was executed by the Title Insurance & Trust Company, and recorded May 3, 1923.

The purchase price of the property was $15,000 per acre for the eight plus acres, being all the land of Mormon Island within the lines of the Norway survey, north of a designated line. Before exercising the option and subsequently, during the improvement of the property in question, the appellees were in frequent communication with the Board of Harbor Commissioners of the City of Los Angeles.

The representative of appellees was present at a meeting of the Board of Harbor Commissioners of December 12, 1922, when the city purchased 5.19 acres of land on Mormon Island lying immediately south of the eight acres of land purchased by appellees. The price was $49,000 per acre, and the deed to the city described the dividing line between said land and appel-

lees' land as the southern boundary line of the land in dispute. If the present contentions of the city are to be accepted, between two and three acres of this land so purchased was tide land and already belonged to the city. The Board was informed of the appellees' plan to abandon its other plants at Alameda, California, Bayonne, New Jersey, and Chicago, Illinois, and concentrate all of its activities in Los Angeles, California. The appellees were encouraged by the Board to make the proposed purchase and were informed that if appellees acquired the property they would have full proprietary rights up to the property line.

Before making the purchase the appellees were anxious to obtain permission to use land adjoining the southerly end of the property it purchased and lying between the property line of that parcel and the pier head line. This proposition was placed before the Board at the time the Board approved the purchase of the 5.19 acres above referred to. The subject of straightening the pier head lien in front of the property was brought up at the same meeting. The matter was left with the assistant city attorney to submit a proposal thereon. This was done by a letter and map of April 25, 1923 embodying the proposal. The letter referred to the land now in dispute as the Company's "private lands" and referred to certain recompense for 87 feet of frontage thereof to be given up by the Company. Also shortly after the receipt of the letter of April 25, 1923, the assistant city attorney proposed to lease tide lands to the Company. The land described in the proposed lease was outside the line of the Norway survey and extended from that line toward the channel on the west side of the Island. Thus, the city recognized the line of the Norway survey as bounding the appellees' property on the west. Other correspondence with the Board and minutes of the Board's meetings in regard to proposed trackage changes of the Municipal Railroad upon the Banning property also showed a recognition of the Norway survey as the boundary of the appellees' property.

After the purchase of the property and occupancy by appellees, the city, in dealing with the property in various ways, recognized the appellees' ownership of the land enclosed within the lines of the Norway survey of Mormon Island. The compre-hensive plan for the erection of the manufacturing plant and distributing facilities on the property was adopted and application was made by appellees to the United States Army Engineer in charge of harbor improvements at Los Angeles Harbor for leave to dredge back of the property line. The application was made because of the fact that some of the improvements were along the waterfront of the Mormon Island channel. This communication contained a complete statement of the proposed improvements together with an estimate of their cost of over $800,000. Notice was given of this application to the public and to the Board of Harbor Commissioners. On behalf of the Board of Harbor Commissioners objections were filed by the city attorney to the proposed plan; but subsequently, these objections were formally withdrawn by the Board. It is clear, therefore, that the Board of Harbor Commissioners was fully advised as to the nature and character of the improvements proposed by the appellees and the value thereof. It appears that the city encouraged the making of such improvements and, in addition, it extensively advertised the fact that the improvements on this land, to cost $1,000,000, were planned and were under construction by appellees. The cost of improvements made, consisting of a three-story reinforced concrete building, power house, boiler room, stock transit sheds, etc., including machines specially designed for borax refining, was over a million dollars ($1,439,263.75) by the end of 1928. All of the improvements, except a small segment of the concrete building, are on the property claimed by the city in this litigation. Streets following the boundary line of the property on the north and east have been laid out by the city and have been in continuous use since the appellees have occupied the premises. The appellees built a permanent fence around the property along the line of the Norway survey. The city solicited and accepted the right of way for a pipe line across the land claimed by the appellees, and in the agreement for the easement stated that the property shown on the map attached thereto was the property of the appellees. The map showed appellees' property as that enclosed by the lines of the Norway survey. Practically the entire pipe line easement was on what the city now claims as its tide land. There can be no doubt from this evidence, and the court

found the fact to be, that the Board of Harbor Commissioners, both by its silence as to any claim of ownership in the property and by actively encouraging the purchase and improvement thereof induced the appellees to purchase the land and to improve it. All this is without serious dispute.

· Appellees claim that under the law of the state of California as developed by the Supreme Court of California in City of Los Angeles v. Cohn, 101 Cal. 373, 35 P. 1002, and in McGee v. City of Los Angeles, 6 Cal.2d 390, 57 P.2d 925, and in Times-Mirror Co. v. Superior Court, 3 Cal.2d 309, 44 P.2d 547, the city is estopped from now claiming the land and improvements in controversy.

In each of these cases the city of Los Angeles was held estopped from exercising its legal rights by reason of the conduct of its officers. The McGee and Times-Mirror cases held that the city could not abandon proceedings to condemn property for street purposes nor for public purposes where it had so conducted itself in connection wtih the condemnation proceedings that to abandon them would work a fraud upon the other party. The case most nearly analogous to the one at bar is the case of Los Angeles v. Cohn, supra, involving the boundary line between the private property and the public street at the intersection of Main, Spring and Temple Streets in Los Angeles. The owner of a building at the intersection believed that the property upon which the building was to be erected was private property. The city attorney had reported to the city counsel that the proposed improvement would not encroach upon the public street. The city thereupon abandoned any objection to its improvement and the owner, acting upon the faith of this abandonment, erected an expensive office building. Subsequently it was claimed by the city that the building encroached upon the public street and the city brought suit to oust the owner of the building from the alleged street. The court held that the city was estopped by its conduct to assert its title thereto, if any.

The city recognizes the principle of estoppel enunciated in these cases but contends the rule is not applicable to tide lands for the reason that the city had no power to make a grant of tide lands and, consequently, it could not do indirectly what it could not do directly, whereas, in the case of public streets the city had authority to abandon such streets notwithstanding the right of the public in the streets, analogous to the rights of the public in tide lands. The city claims that the nature of a tide lands title being a trust in the State for the public, is by nature inalienable, the constitution of the State of California expressly prohibits the alienation of the tide lands within two miles of the city; that the act of the state legislature conveying the tide lands in and around Los Angeles harbor to the city of Los Angeles, expressly prohibited the transfer of such tide lands in private ownership and that the charter of the city of Los Angeles also prohibited the grant of its tide lands. § 3, Article 15, Constitution of the State of California; Stats.Cal., 1911, p. 1256, amended, Stats. of Cal.1917, p. 159; § 140 (a), Charter of City of Los Angeles, Stats. of Cal.1925, p. 1073. It is therefore argued that inasmuch as neither the city nor the state could grant tide lands, no matter what consideration was offered or accepted therefor it follows that the law of estoppel is not applicable in considering the right of the city to tide lands. The appellees do not contest this legal proposition where the land in question is known to be tide land, but assert that the land in question was not known tide land, that the boundary lines were in dispute and that the city had authority to settle the disputed question as to whether or not the land was tide land and to ascertain and agree to the location of the boundaries of the tide lands. In support of this contention appellees cite the decisions of the Supreme Court of California in Muchenberger v. City of Santa Monica, 206 Cal. 635, 275 P. 803; Strand Improvement Co. v. City of Long Beach, 173 Cal. 765, 161 P. 975; Dunn v. Long Beach, etc., Co., 114 Cal. 605, 46 P. 607, and Boone v. Kingsbury, 206 Cal. 148, 186, 273 P. 797.

It would seem unnecessary to cite authorities to support the conclusion that the state, as owner of the tide lands could agree with an upland owner as to the boundary between the state owned lands and the privately owned lands if there was any doubt about the location of the boundary line. This right would be inherent in the trust and necessary to the complete utility and improvement of the state owned tide land because the mean

high tide line ordinarily is a shifting one due to the action of the surf. The inherent right of the state to exercise power reasonably incidental to the trust was declared in People v. California Fish Co., 166 Cal. 576, 584, 138 P. 79, and reasserted in an action involving the title to the tide land grant No. 152 above referred to. People v. Banning Co., 166 Cal. 635, 138 P. 101, supra. The question, however, has been more specifically settled in California by the decision of Muchenberger v. City of Santa Monica, 206 Cal. 635, 275 P. 803, supra, wherein the boundary line between tide land and upland, was fixed by an agreement between the City of Santa Monica and the upland owner. The agreement was upheld as a proper exercise of the power of the sovereign as owner of tide lands. It was held that such an agreement was not a conveyance of tide lands within the meaning of the constitution of California, Art. 15, sec. 3, prohibiting the grant or sale to private persons of tide lands located within two miles of a municipal corporation.

It thus appears that the claim of estoppel advanced by the appellees and sustained by the trial court must be predicated upon the right and power of the city to fix the boundary line of its tide lands by agreement with the upland owner. It is thus claimed that the city, being in doubt as to the location of the mean high tide line, had power to fix such boundary and that the acts and conduct of the city in relation to this tract of land in effect constitute an implied agreement fixing the line of the Norway survey as the boundary of Mormon Island upland.

Appellant contends, however, that the City Charter (§§ 21, 42 (4), Statutes 1925 pp. 1041, 1048) prescribes the manner in which it may enter into contracts and that any agreement fixing the boundary line of its property must comply with these sections.

It is true that the city did not enter into an express agreement for the fixing of boundaries, but the officers charged with the duty of determining those boundaries were not only fully cognizant of the purchase and improvement of the property by the appellees but also by formal action inferentially recognized appellees' title and right to improve and develop the property in question.

As we think it is clear under the decisions of the Supreme Court of California that when acting in good faith the city could make a reasonable agreement fixing the exact location of the mean high tide line where that location is in doubt, we state with more particularity than we have done some of the evidence in the case indicating the uncertainty which existed as to whether or not the land within the lines of the Norway survey were tide lands.

The trial court found that at all times prior to the decision of the Supreme Court in the instant case the location of the boundary line between tide lands and uplands on Mormon Island was a matter of doubt. It found there was a doubt as to whether or not a boundary line was the average of the neap tides or whether it was an average of the high tides.

It was first definitely established by the decision of the Supreme Court herein that the average line of all the high tides for a period of 18.6 years was the boundary line between the tide land and the upland. In addition to the uncertainty in the law as to the boundary line there was a question as to the effect of changes in that line brought about by the improvement of the harbor and particularly by a phenomenon increasing the height of the water at high tide, known as seiche. This phenomenon exists in a number of harbors, but its extent is determined by the configuration of each particular harbor. This phenomenon manifests itself as a vertical movement of the waters in the Los Angeles Harbor, reaching its maximum and minimum in a period of approximately 55 minutes. The evidence is that this seiche in Los Angeles Harbor averaged .3 of a foot and ordinarily raised the height of the high tide by that amount. This additional height of the water at high tide was probably due to local and terrestrial influences. The trial court held that this seiche was not a part of the tide and that the mean high tide line therefore should not be increased by the amount of the seiche. All the maps and surveys which had been made prior to very recent times were based upon the actual or estimated height of the water and apparently it was not until the placing of the devices at Los Angeles Harbor for continuously registering the height of the water that the extent of the seiche there became known. In view of the fact that the mud flats of Mormon Island are almost

58

horizontal a difference in tide of between three and four inches would make a great difference in the area covered by the tide.

The burial of the surface of the tide lands by an overburden of six feet, later increased to as much as 16 feet in places, increased the difficulty of locating the original mean high tide line. According to some of the testimony the range of tides was increased by the improvement of the harbor. There is also evidence to the effect that the surface of the soft mud underlaid with quick sand which composed the tide flats of Mormon Island has been depressed by the weight thereby placed upon it by the filling in with dredged material. Maps showing soundings, elevations and surface of Mormon Island were devoid of necessary detail to fix the mean high tide line. These considerations made it difficult to locate the mean high tide line on the Island and desirable that it should be definitely fixed in view of the rapid and extensive development of the harbor.

We conclude that the City of Los Angeles, owner of the tide lands in the Inner Bay of San Pedro, by virtue of the conveyance to it from the State of California by statutory grant in 1911, had the power and authority to determine the boundary lines of such tide lands by agreement with the upland owners. We hold that the acts and conduct of the city and its officials in charge of the harbor improvements in dealing with the lands claimed by the appellees whereby the appellees had been induced to invest approximately a million and a half dollars, present an exceptional case for the application of the doctrine of estoppel in pais, one clearly within the principle of the decisions of the California Supreme Court in City of Los Angeles v. Cohn, supra, McGee v. City of Los Angeles, supra, and Times-Mirror Co. v. Superior Court, supra, and that the city is therefore estopped from denying that the boundary lines thus recognized by it are not in fact the boundary lines of the uplands claimed by the appellees. In view of these conclusions it is unnecessary to decide many of the points advanced by the appellees in support of the judgment nor to consider points other than those herein discussed which were raised by the appellant.

The decree of the District Court is affirmed.